USA v. Gupta

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2012

(Argued:  May 21, 2013                                          Decided:  March 25, 2014)

Docket No. 12-4448

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

RAJAT K. GUPTA,

Defendant-Appellant.

_____

Before:  NEWMAN, KEARSE, and POOLER, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York, Jed S. Rakoff, Judge, convicting defendant of securities fraud, see 15 U.S.C. §§ 78j(b) and 78ff, and conspiracy to commit securities fraud, see 18 U.S.C. § 371, based on insider trading.

Affirmed.

RICHARD C. TARLOWE, Assistant United States Attorney, New York, New York (Preet Bharara, United States Attorney for the Southern District of New York, Damian Williams, Edward B. Diskant, Justin S. Weddle, Assistant United States Attorneys, New York, New York, on the brief), for Appellee.

SETH P. WAXMAN, Wilmer Cutler Pickering Hale & Dorr, Washington, D.C. (Paul R.Q. Wolfson, Megan Barbero, Daniel Aguilar, Wilmer Cutler Pickering Hale & Dorr, Washington, D.C.; Gary P. Naftalis, David S. Frankel, Alan R. Friedman, Robin M. Wilcox, Kramer Levin Naftalis & Frankel, New York, New York; Peter G. Neiman, Alan E. Schoenfeld, Wilmer Cutler Pickering Hale & Dorr, New York, New York, on the brief), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Rajat Gupta ("Gupta") appeals from a judgment entered in the United States District Court for the Southern District of New York on November 9, 2012, following a jury trial before Jed S. Rakoff, Judge, convicting him on three counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371. Gupta was sentenced principally to 24 months' imprisonment, to be followed by a one-year term of supervised release, and was ordered to pay a fine of $5,000,000. In an amended judgment entered in February 2013, Gupta was also ordered to pay restitution in the amount of $6,218,223.59, an order that is the subject of a separate appeal that has been held in abeyance pending decision of the present appeal. In the present appeal, Gupta challenges his conviction, contending principally that he is entitled to a new trial on the grounds that the trial court erred (1) by admitting statements of a coconspirator, recorded in wiretapped telephone conversations to which Gupta was not a party, and (2) by excluding relevant evidence offered by Gupta. For the reasons that follow, we conclude that Gupta's contentions lack merit, and we affirm the judgment.

## I.  BACKGROUND

At the times pertinent to this prosecution, Gupta was a member of the board of directors of The Goldman Sachs Group, Inc. ("Goldman Sachs" or "Goldman"), the global financial services firm headquartered in New York.  Gupta was also involved in several financial ventures with Raj Rajaratnam (or "Raj"), founder of The Galleon Group ("Galleon"), a family of hedge funds that invested billions of dollars for its principals and clients.  The present prosecution arose out of a multiyear government investigation of insider trading at Galleon which included court-authorized wiretaps of Rajaratnam's cell phone, see United States v. Rajaratnam, 719 F.3d 139, 144-45 (2d Cir. 2013).

During its investigation, the government discovered evidence indicating, inter alia, that Rajaratnam was receiving inside information about Goldman Sachs from Gupta and trading on that information.  Eventually, Gupta was charged with six counts of securities law violations.  Count One of the superseding indictment on which Gupta was tried (the "Indictment") alleged, inter alia, that Gupta, Rajaratnam, "and others . . . conspire[d] . . . to commit . . . securities fraud" (Indictment ¶ 30); that "GUPTA disclosed . . . Inside Information" about Goldman Sachs "to Rajaratnam, with the understanding that Rajaratnam would use the Inside Information to purchase and sell securities" (id. ¶ 12(b)); and that Rajaratnam, knowing the information he received from Gupta was confidential, "shared the Inside Information with other coconspirators at Galleon and caused the execution of transactions in the securities of Goldman Sachs" (id. ¶ 12(c)).  The object of the conspiracy was the "purchase and sale of securities" in order to "receive illegal profits and/or illegally avoid losses" (id. ¶¶ 31 and 32(b)) based on "GUPTA['s] disclos[ure of] Inside Information obtained from Goldman

Sachs" to Rajaratnam, which information "Rajaratnam shared . . . with other coconspirators at Galleon" (id. ¶¶ 32(a) and (d)). Gupta was convicted on the conspiracy count and on three substantive counts of securities fraud (Counts Three, Four, and Five), all relating to trades of Goldman Sachs stock by Rajaratnam based on confidential inside information Rajaratnam received from Gupta in the fall of 2008.

A.  Evidence Supporting the Counts of Conviction

All of the government's evidence that Gupta passed confidential information about Goldman Sachs to Rajaratnam, on the basis of which Rajaratnam made purchases or sales of Goldman stock, was circumstantial. Most of the evidence described below was presented through testimony from employees of Galleon or Goldman, wiretapped telephone calls between Rajaratnam and other Galleon employees, records of calls made to or from telephones used by Gupta or Rajaratnam, and records as to the timing of trades by Galleon in Goldman Sachs stock.

1.  Galleon Trades of Goldman Sachs Stock on September 23, 2008

At 3:15 p.m. on September 23, 2008, Goldman Sachs held a special meeting of its board of directors. The purpose of the meeting was to approve an investment of $5 billion in Goldman by Warren Buffett. The imminent investment was highly confidential, as it was likely to have "a meaningful impact" on Goldman's stock price. (Trial Transcript ("Tr.") 1590.) It was to be announced to the public after the 4 p.m. close of trading on the New York Stock Exchange.

Gupta, a former managing director of the consulting firm McKinsey & Company ("McKinsey"), participated in the Goldman Sachs board meeting via telephone from a conference

4

room at McKinsey's New York office. Telephone records indicated that Gupta was on the Goldman Sachs conference call from 3:13 p.m. until 3:53 p.m.

At approximately 3:54 p.m., Gupta's assistant, Renee Gomes, dialed Rajaratnam's direct line; the McKinsey conference room telephone from which Gupta had participated in the Goldman Sachs board meeting was then connected to the call to Rajaratnam's line. The connection between Rajaratnam's line and the telephone Gupta used lasted approximately 30 to 35 seconds.

Caryn Eisenberg, Rajaratnam's assistant in 2008-2009, testified that on September 23, 2008, she answered a call on his direct line at about 10 minutes before the 4:00 p.m. market close. As a general rule Eisenberg was not to put calls through to Rajaratnam near the end of the trading day, but she put the caller on hold, located Rajaratnam, and put the call through. Although at the time of trial Eisenberg no longer remembered the name of the man who was on the line, she testified that she put this call through because his name was on the short list of persons whose calls Rajaratnam would accept near the end of the trading day; she recognized his voice as that of a frequent caller; and the man said it was "urgent" that he "speak to Raj." (Tr. 238-39.)

Rajaratnam took the call in his office and was on the telephone only briefly. Eisenberg testified that Rajaratnam thereafter summoned Galleon cofounder Gary Rosenbach into his office and the two had a closed-door conversation. Rosenbach then "went back to his desk," picked up his telephone, "and started saying buy Goldman Sachs." (Id. at 254.)

Galleon trader Ananth Muniyappa testified that at approximately 3:56 p.m. on September 23, Rajaratnam, as he was hanging up his telephone, instructed Muniyappa, who was at his own desk nearby, to purchase 100,000 shares of Goldman Sachs stock. When Muniyappa determined that he would probably be unable to buy as many as 100,000 shares before the market's

close (he managed to buy only a total of 67,200 shares), he quickly informed Rajaratnam, who promptly instructed Rosenbach to buy Goldman stock.

Rosenbach proceeded to buy 200,000 shares of the stock, 150,000 for Rajaratnam's portfolio--which specialized in technology stocks--and 50,000 for Rosenbach's own portfolio. Rosenbach also bought 1.5 million shares (1,000,000 for Rajaratnam's portfolio and 500,000 for his own) of a financial-sector index fund made up of stocks of several institutions, including Goldman. Each of these trades was made in the final "three to four minutes" of the trading day (Tr. 401), i.e., between approximately 3:56 p.m. and 4:00 p.m. In all, the Goldman Sachs stock purchased by Muniyappa and Rosenbach at the behest of Rajaratnam in the final minutes of the trading day on September 23--excluding the shares of the index fund--cost more than $33 million.

Warren Buffett's $5 billion investment in Goldman Sachs was announced at approximately 6:00 p.m. on September 23. The next morning, Goldman's stock price rose to a high nearly 7% above its September 23 closing price. A government witness testified that the profits on the above Galleon purchases of Goldman stock at the end of the trading day on September 23 exceeded $1 million.

Eisenberg testified that after Rajaratnam took the urgent call near the close of trading on September 23 he was smiling more than usual. (See Tr. 259.) But not everyone at Galleon was happy. Leon Shaulov was a Galleon trader and portfolio manager. Muniyappa did not buy any Goldman Sachs stock for Shaulov on September 23. Muniyappa testified that that evening, shortly after Goldman announced the Warren Buffett investment, Shaulov sent Rosenbach an email saying, "Thanks for the heads up, by the way. I'm short 170 million in financials. Not one word from anyone. Thank you very much. All I get is sick dilution. Zero help. Zero." (Id. at 441-42; see also id. at 439

6

(a "short" position is one speculating that the market price will go down).)

On the morning of September 24, 2008, before the stock markets opened, Rajaratnam placed two calls from his cell phone (which was wiretapped) to Ian Horowitz, his principal trader. In the first call, at 7:09 a.m., Rajaratnam began to tell Horowitz about the events of the previous afternoon:

> RAJ RAJARATNAM: . . . . So, big drama yesterday, but I have to ....
>
> IAN HOROWITZ: Yeah, I, I, I heard.
>
> RAJ RAJARATNAM: Hum.
>
> IAN HOROWITZ: I heard a little, um, you mean the last three minutes of the day?
>
> RAJ RAJARATNAM: No, I got a call at 3:58, right?
>
> IAN HOROWITZ: Yeah.
>
> RAJ RAJARATNAM: Saying something good might happen to Goldman. Right?
>
> IAN HOROWITZ: So it is what it is. Everything's, everyone's fine, I saw it cross the board....
>
> RAJ RAJARATNAM: No I saw, I, so, I told Ananth [Muniyappa] to buy some, he was fucking around, he can't, you know. So I went to Gary [Rosenbach] and said just buy me, right?
>
> IAN HOROWITZ: Mm hmm.
>
> RAJ RAJARATNAM: Because you were not there. It happens all the fucking time, you know you're there every day of the year, right? . . . .

(Government Exhibit ("GX") 21-T ("First Rajaratnam-Horowitz Call"), at 1-2 (emphases added).)

Rajaratnam called Horowitz again at 7:56 a.m. After asking how much Goldman Sachs stock Galleon currently owned, Rajaratnam continued his report on the previous afternoon's events:

RAJ RAJARATNAM:  Okay, yeah, let me tell you what happened, honestly, right?

IAN HOROWITZ:  Yeah, no, I looked at our price, I looked at our price, and I looked at what happened.

RAJ RAJARATNAM:  Yeah.

IAN HOROWITZ:  Someone had this before us, someone, whatever went on, something happened, someone, they ...

RAJ RAJARATNAM:  I got a call, right, saying something good's gonna happen.

IAN HOROWITZ:  We'll talk about, how 'bout this, we'll talk when you come in.

RAJ RAJARATNAM:  Okay.

IAN HOROWITZ:  We'll talk when you come in, okay?

RAJ RAJARATNAM:  But I didn't do anything, you were not there, I asked Ananth to buy some.

IAN HOROWITZ:  You did nothing.

RAJ RAJARATNAM:  Then I went to Gary ... and ...

IAN HOROWITZ:  You did nothing wrong.

RAJ RAJARATNAM:  Yeah at 3:58, I can't, I can't yell out in the fucking halls.

IAN HOROWITZ:  No.  You did nothing wrong, we'll talk about it when you come in, nothing's wrong.

RAJ RAJARATNAM:  It is, I guess, Leon [Shaulov] was very upset. You know, fuck him, look, I've kept my mouth shut when he gave me WaMu, right?

IAN HOROWITZ:  Get, get upset about what?  You got nothing, this is at 3:58.

RAJ RAJARATNAM: Yeah, if it was, one o'clock, I always am good with him, I always call him in, I tell him everything, you know? AMD, IBM, everything, right?

IAN HOROWITZ: He's not in, so I'm, he hasn't said anything. Listen, if something comes in, I'll let you know.

(GX 22-T ("Second Rajaratnam-Horowitz Call"), at 2-3 (emphases added).)

2. Galleon Trades of Goldman Sachs Stock on October 24, 2008

On October 23, 2008, more than halfway through the fourth quarter of Goldman Sachs's fiscal year, Goldman's chairman convened an unofficial board meeting by conference call to bring the directors up-to-date on company events. At that time, Wall Street analysts were projecting that Goldman--which, since becoming a public company, had never reported a quarterly loss--would continue to report profits. In the conference call, which began at 4:15 p.m., Goldman's management informed the board that the company's fourth-quarter result would be a loss.

Records were introduced to show that Gupta, on a telephone in his home office, participated in the Goldman Sachs conference call for approximately 33 minutes and disconnected at 4:49 p.m. At 4:50 p.m., a call was placed from the telephone of Gupta's assistant Renee Gomes to the direct office line of Rajaratnam; Gupta's home office line was conferenced in to that call, and Gomes's line was disconnected. Gupta's home office telephone was connected to Rajaratnam's direct line for some 12½ minutes, until 5:03 p.m.

The next morning, October 24, 2008, in three transactions, Rajaratnam sold a total of 150,000 shares of Goldman Sachs stock. The first 50,000 shares were sold at 9:31 a.m., one minute after the stock market opened--the first opportunity to trade in Goldman shares since the board

meeting the previous day. Another 50,000 shares were sold at 10:09 a.m.; and the final 50,000 shares were sold at 10:37 a.m. Goldman Sachs's fourth-quarter losses were not announced to the public until December 16. Based on the decline in Goldman's stock price after that announcement, the government introduced calculations showing that Rajaratnam, by selling his shares on October 24, avoided a loss of more than $3.8 million.

At 12:12 p.m. on October 24, Rajaratnam returned a call to David Lau, a Singapore-based portfolio manager for Galleon International, one of Galleon's hedge funds. Lau had sought to reach Rajaratnam for general investment advice. Galleon International invested in non-U.S. securities primarily (see Tr. 1467), but not exclusively (see id. at 2415); and it had in the past owned stock in Goldman (see GX 90). The conversation began with Rajaratnam advising that, as a general matter, it would be safer to invest in United States companies than in emerging market countries:

> RAJ RAJARATNAM: Hey David, you called?

> DAVID LAU: Yeah, just to give me, give me a, find the pulse because we are quite shocked overseas and uh long bonds, I mean quite shocked in relative for the VAR ... because VAR broke out, blew out and our positions are the same so I just want to find out what you guys are thinking.

> RAJ RAJARATNAM: Yeah, I mean, I think, ah we think that the US is um relatively the safe haven, right.

> DAVID LAU: Um.

> RAJ RAJARATNAM: Because all of these um emerging market ah countries, many of them have to reduce interest rates, which is bad for their currencies, right.

> DAVID LAU: Um um um.

> RAJ RAJARATNAM: And, I mean today for example there is a reasonable calmness in the market you know the market is only down 2 or 3%, right.

DAVID LAU: Yeah, that's why I'm surprised. I thought it would go nuts.

RAJ RAJARATNAM: Yeah I mean our risk here is ah hedge fund redemption risk, right Citadel I hear is in trouble, you know, and things like that but I think generally, not that I want to be long equities, but generally I think one trade in equities would be, you know, buy the Spiders and short the EEMs or something, you know.

DAVID LAU: Hmm Hmm.

RAJ RAJARATNAM: But it looks like here the most cyclical companies the semi equipment companies, and the home builders are the ones that are leading the way out right.

DAVID LAU: Right.

(GX 29-T ("Rajaratnam-Lau Call"), at 1-2 (emphasis added).)

Rajaratnam then proceeded to describe to Lau the confidential negative information he had received the previous day "from somebody who's on the Board of Goldman Sachs," which "they don't report until December." (GX 29-T, at 2.) Rajaratnam noted the current optimistic view of Wall Street analysts of Goldman Sachs's likely profits, and he described the potential for selling the stock short:

RAJ RAJARATNAM: Um, now I, I heard yesterday from somebody who's on the Board of Goldman Sachs, that they are gonna lose $2 per share. The Street has them making $2.50.

DAVID LAU: Really?

RAJ RAJARATNAM: You know. Yeah. Now I can get that number, you know, one, they don't report until December, they, I think their quarter ends in November, but (UI [i.e., unintelligible]) one more, but you know they have these huge marks in ICBC and all of that stuff right. That uh is getting absolutely clobbered. You know.

DAVID LAU: Right.

11

RAJ RAJARATNAM: So what he was telling me was that uh, Goldman, the quarter's pretty bad. They have zero revenues because their trading revenues are offset by asset losses, and to date they have lost $2 per share, they just announced a 10% cut and uh you know, the basic business is ok but uh you know this is uh tough for them. I don't think that's built into Goldman Sachs stock price. So if it gets to $105, I'm gonna, it's $99 now, it was at $102. I was looking for $105, I'm gonna whack it you know.

DAVID LAU: (Laughs) Okay. Okay. Okay (UI) ...

RAJ RAJARATNAM: Okay, I don't think it makes sense to take longer term views right now. . . .

(GX 29-T, at 2 (emphases added).)

3. The Relationship Between Gupta and Rajaratnam

The government also presented evidence that Gupta and Rajaratnam had a close relationship. Gupta described Rajaratnam as a "close friend[]" (GX 1905)--indeed, "a very close friend" (GX 1922)--and was in frequent communication with him. Rajaratnam's address book noted Gupta as a "Good friend." (Tr. 223.) Rajaratnam had instructed Eisenberg that there were only five people she was authorized to connect with him near the end of the trading day; Gupta was one of them. (See id. at 210, 213-14; see also id. at 273 (during the two years when Eisenberg was Rajaratnam's assistant, the list was expanded to about 10 names).)

Gupta and Rajaratnam were also involved in several business ventures together. In 2005, they, along with a third partner, formed Voyager Capital Partners Ltd. ("Voyager"), an investment fund capitalized with $50 million, $5 million of which was contributed by Gupta and $40 million by Rajaratnam; Gupta later borrowed $5 million from Rajaratnam in order to buy out the third partner's share (see Tr. 1858-59), giving Gupta a $10 million stake in Voyager. Other

collaborations were discussed in a July 29, 2008 call from Gupta to Rajaratnam (see GX 9-T ("Gupta-Rajaratnam Call"))--the only call between these two that was captured in the wiretaps. In 2007, Gupta, Rajaratnam, and two others launched another investment fund, New Silk Route, in which Rajaratnam invested $50 million (see id. at 8); Gupta was the chairman (see GX 2164). Gupta was also heavily involved in Galleon itself. He had invested several million dollars in Galleon funds; he was involved in the planning of a new Galleon fund called Galleon Global (which ultimately was not created); he had a keycard allowing him access to Galleon's New York offices; and he regularly worked on Galleon's behalf in seeking potential investors (see GX 9-T, at 13-14). In early 2008, Gupta was made chairman of Galleon International, which, as of April 2008, managed assets totaling some $1.1 billion and could earn "performance fees" (Tr. 1696). Gupta was given a 15 percent ownership stake. (See, e.g., id.; GX 9-T, at 6; id. at 13 (Gupta: "you've given me . . . a position in Galleon International").)

In the July 2008 Gupta-Rajaratnam Call, Rajaratnam asked Gupta about a rumor that Goldman Sachs might seek to buy a commercial bank. Gupta responded that there had been "a big discussion" of that possibility, in particular with respect to "Wachovia," as well as of the possibility of buying an insurance company, in particular "AIG." (GX 9-T, at 2-3.) Gupta said the Goldman board was divided and that such purchases were unlikely to be "imminent," but that if certain banks were "a good deal . . . it's quite conceivable they'd come and say let's go buy" one. (Id. at 3-4.) The board's discussions were confidential. (See, e.g., Tr. 856-58.) Even the matter of whether or not a subject had been discussed at a Goldman board meeting was confidential. (See, e.g., id. at 2048.)

B. The Defense Case

Gupta called several witnesses in his defense. Most were character witnesses who testified that they believed Gupta to be an honest person; Gupta also sought to have them testify that he had "integrity" and thus would not have been inclined to share inside information with Rajaratnam. Gupta's daughter Geetanjali Gupta ("Geetanjali") testified about certain conversations Gupta had with her about Rajaratnam, and sought to indicate that Gupta would not have been inclined to share inside information with Rajaratnam because Gupta believed Rajaratnam had cheated him out of money with respect to the Voyager investment. Gupta also sought to introduce documentary evidence suggesting that a different Goldman Sachs insider was giving Rajaratnam confidential information about Goldman Sachs, and that Gupta contemplated leaving a substantial portion of his wealth to charity. As discussed in greater detail in Part II.B. below, the trial judge imposed limitations with respect to each category of Gupta's proposed evidence.

C. The Verdict

The jury found Gupta guilty on four of the six counts against him: Count One, conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and three substantive counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff. The substantive securities fraud convictions were on Count Three, based on Rosenbach's purchase of 150,000 shares of Goldman Sachs stock for Rajaratnam on September 23, 2008; Count Four, based on Muniyappa's purchase of 67,200 shares of Goldman Sachs stock for Rajaratnam on September 23, 2008; and Count Five, based on Rajaratnam's sale of 150,000 shares of Goldman Sachs stock on October 24, 2008.

Gupta was sentenced principally to 24 months' imprisonment and ordered to pay a $5 million fine. This Court granted his motion for bail pending appeal.

## II. DISCUSSION

On appeal, Gupta argues principally that Rajaratnam's wiretapped conversations with Horowitz and Lau were inadmissible hearsay; that the trial court erred in curtailing evidence proffered by Gupta in his defense; and that the errors, either singly or in combination, entitle him to a new trial. For the reasons that follow, we disagree.

A. The Wiretap Evidence

Preliminarily, we note that Gupta's brief on appeal challenged the admission of any wiretapped conversations, including the conversation between Rajaratnam and Gupta himself, on the ground that the wiretap authorizations were obtained in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, see 18 U.S.C. §§ 2510-2522, and the Fourth Amendment to the Constitution. Rajaratnam, who was prosecuted and convicted on multiple counts of securities fraud and conspiracy, had raised such challenges in his case; and Gupta's brief on appeal stated that Gupta was raising the same issues as Rajaratnam and was adopting the challenges made in Rajaratnam's appeal. Rajaratnam's challenges were rejected in United States v. Rajaratnam, 719 F.3d at 151-57, 160. Gupta's Title III and constitutional challenges are thus foreclosed.

With respect to Rajaratnam's statements in his two conversations with Horowitz and in his conversation with Lau, Gupta also objected to their admission on the ground that they were

15

hearsay. The government contended that Rajaratnam's statements either were nonhearsay because they were statements in furtherance of a conspiracy of which Rajaratnam and Gupta were members, see Fed. R. Evid. 801(d)(2)(E), or were hearsay statements within the exception for declarations against penal interest, see Fed. R. Evid. 804(b)(3), or within the residual hearsay exception, see Fed. R. Evid. 807.

The district court found that the government had sufficiently established the existence of a conspiracy among Gupta, Rajaratnam, and others (see Tr. 430-31, 434-35, 440), and that Rajaratnam's statements in each of the three conversations were in furtherance of the conspiracy. The court thus ruled that all three conversations were admissible under Rule 801(d)(2)(E). (See Tr. 633-35, 695; see also Hearing Transcript, May 16, 2012 ("Hearing Tr."), at 4, 24-25.)

The district court rejected outright the government's contention that Rajaratnam's statements were admissible under the residual hearsay exception. And the court stated that it was "dubious" as to whether the statements could be admitted as statements against penal interest but that it need not resolve that issue in light of its ruling that they were admissible as nonhearsay statements in furtherance of a conspiracy of which Rajaratnam and Gupta were members. (Hearing Tr. 4.)

Gupta challenges the rulings that Rajaratnam's statements to Lau and Horowitz were in furtherance of a conspiracy of which Gupta was a member. He contends that Lau was not alleged to be a coconspirator and that Rajaratnam's statements to Horowitz were in furtherance only of a separate conspiracy between Rajaratnam and Shaulov. The government defends the court's admission of the Rajaratnam statements as coconspirator statements in furtherance of a conspiracy of which Rajaratnam and Gupta were not the only members; in addition, it argues that Rajaratnam's statements could properly have been admitted as statements against his penal interest. We conclude that, under

16

Rules 801 and 804 of the Federal Rules of Evidence, Rajaratnam's statements in all three conversations were admissible both as nonhearsay statements in furtherance of the Rajaratnam-Gupta conspiracy and under the exception for statements against penal interest. We address these issues separately with respect to the statements to Horowitz and those to Lau.

### 1. Statements in Furtherance of a Conspiracy

Under Rule 801(d), an out-of-court statement offered for the truth of its contents is not hearsay if "[t]he statement is offered against an opposing party and" it "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Thus, "[i]n order to admit a statement under this Rule, the court must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990), cert. denied, 501 U.S. 1233 (1991). In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself. See Fed. R. Evid. 801(d)(2); see also Bourjaily v. United States, 483 U.S. 171, 176-81 (1987).

"To be in furtherance of the conspiracy, a statement must be more than 'a merely narrative' description by one co-conspirator of the acts of another." United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 88 (2d Cir. 1999) ("SKW Metals") (quoting United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir.) ("Beech-Nut"), cert. denied, 493 U.S. 933 (1989)).

While idle chatter between co-conspirators does not further a conspiracy, see United States v. Paone, 782 F.2d 386, 390 (2d Cir.), cert. denied, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986), we have recognized that "[s]tatements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy, further the ends of [a] conspiracy."

United States v. Simmons, 923 F.2d 934, 945 (2d Cir.) (quoting United States v. Rahme, 813 F.2d 31, 35-36 (2d Cir. 1987) (other internal quotation marks omitted)), cert. denied, 500 U.S. 919 (1991); see, e.g., United States v. Maldonado-Rivera, 922 F.2d at 958-59.

"A finding as to whether or not a proffered statement was made in furtherance of the conspiracy should be supported by a preponderance of the evidence, and such a finding will not be overturned on appeal unless it is clearly erroneous." United States v. Thai, 29 F.3d 785, 814 (2d Cir.), cert. denied, 513 U.S. 977 (1994); see, e.g., United States v. James, 712 F.3d 79, 105-06 (2d Cir.), petition for cert. filed, No. 13-632 (U.S. Nov. 22, 2013). "'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" Beech-Nut, 871 F.2d at 1199 (quoting Anderson v. Bessemer City, 470 U.S. 564, 574 (1985)). The court's ultimate decision to admit or exclude a proffered statement is reviewed for abuse of discretion. See, e.g., United States v. Persico, 645 F.3d 85, 99 (2d Cir. 2011), cert. denied, 132 S. Ct. 1637 (2012); SKW Metals, 195 F.3d at 87-88.

a. Rajaratnam's in-Furtherance Statements to Horowitz

We see no error or abuse of discretion in the district court's admission of the statements by Rajaratnam in his two telephone conversations with Horowitz. Although Gupta insists that Rajaratnam had a "separate conspiracy with Shaulov" (e.g. Gupta brief on appeal at 38, 39), that

18

Rajaratnam's statements to Horowitz were "focus[ed] on placating Shaulov" (id. at 37), and that "Rajaratnam's conversation with Horowitz was not 'in furtherance of' the alleged Rajaratnam/Gupta conspiracy" (id. at 36; see id. at 37 ("placating Shaulov had nothing to do with furthering the alleged conspiracy between Rajaratnam and Gupta")), that argument suffers from multiple flaws. First, the Indictment did not allege a conspiracy only between Rajaratnam and Gupta; it alleged that the conspiracy also encompassed "other coconspirators at Galleon" (Indictment ¶¶ 12(c), 32(d)). Second, so long as a coconspirator statement was in furtherance of the conspiracy, there is no requirement that it have been in furtherance of the interests of the defendant himself or of any particular coconspirator. Third, there was ample evidence that the conspiracy of which Gupta and Rajaratnam were members included Horowitz, Rosenbach, and Shaulov.

For example, after receiving the September 23 call at 3:54 p.m. from Gupta, Rajaratnam had a closed-door conversation with Rosenbach; Rosenbach immediately began buying Goldman Sachs stock and shares of an index fund that included Goldman stock; Rosenbach made those purchases not only for Rajaratnam's portfolio but for his own portfolio as well; and after the market closed, Rosenbach returned to Rajaratnam's office for another closed-door conversation (see Tr. 254-55). That evening, when Shaulov bitterly complained that he had not been given a "heads up" on the Buffett investment, he complained to Rosenbach. (Id. at 441-42.) The next morning, Rosenbach sent Rajaratnam an email stating "I spoke to Leon and believe I diffused [sic] him." (GX 1632.) Rajaratnam, in his conversations with Horowitz that morning, explained why he had not immediately informed Horowitz and Shaulov upon receipt of the September 23 Goldman Sachs information. In his first call, Rajaratnam pointed out that Horowitz, who was the head of the Galleon trading desk and the trader principally responsible for executing trades for Rajaratnam (see Tr. 205,

19

361), had not been in the office when the call came in. The district court found that this conversation was in furtherance of the conspiracy of which Gupta was a member because Rajaratnam needed to explain to Horowitz, his trader, why the purchases of Goldman stock were made (see Hearing Tr. 19-20); and the court found that the ensuing conversation between Rajaratnam and Horowitz "reeks of knowledge, intent, and the need of Mr. Rajaratnam to explain to his lieutenant why in his absence the significant trade occurred" (id. at 21). In that second conversation, Rajaratnam told Horowitz that Shaulov was upset but should not have been because the call about Goldman Sachs came in late, at "3:58"; had it come in at "one o'clock," Rajaratnam would have informed Shaulov because he "always" relayed "everything" to Shaulov. (GX 22-T, at 3.)

Thus, there was ample evidence to support findings (1) that the members of the conspiracy in which Gupta passed confidential Goldman Sachs information to Rajaratnam included not only Gupta and Rajaratnam but also Rosenbach, Horowitz, and Shaulov, and (2) that Rajaratnam's statements and explanations to Horowitz served to further the conspiracy by informing Horowitz, and eventually Shaulov, of the status of that conspiracy, reassuring them of its continuity, and preserving trust and cohesiveness among the coconspirators. Rajaratnam's statements in his telephone calls to Horowitz were properly admitted under Rule 801(d)(2)(E).

### b. Rajaratnam's in-Furtherance Statements to Lau

Although the government concedes that Lau was not a member of the alleged conspiracy, the district court admitted under Rule 801(d)(2)(E) Rajaratnam's statements to Lau as well. While that Rule "'requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, there is no requirement that the person to whom the statement

is made also be a member.'" In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 139 (2d Cir. 2008) ("Terrorist Bombings") (quoting Beech-Nut, 871 F.2d at 1199) (emphasis ours), cert. denied, 558 U.S. 1137 (2010). Statements designed to induce the listener's assistance with respect to the conspiracy's goals satisfy the Rule's in-furtherance requirement. See, e.g., Terrorist Bombings, 552 F.3d at 139; Beech-Nut, 871 F.2d at 1199 ("Coconspirator statements may be found to be 'in furtherance' of the conspiracy within the meaning of Rule 801(d)(2)(E) if they 'prompt the listener to respond in a way that facilitates the carrying out of criminal activity.'" (quoting United States v. Rahme, 813 F.2d at 35)).

Applying these principles, we conclude that there was no clear error in the district court's finding that Rajaratnam's statements to Lau were in furtherance of a conspiracy of which Gupta and Rajaratnam were members. Lau was a portfolio manager for Galleon International, seeking to make profitable investment decisions for his portfolio. The Rajaratnam-Lau Call resulted from Lau's solicitation of Rajaratnam's view of "the pulse" of the market. (GX 29-T, at 1.) The conversation took place on October 24, 2008, shortly after Rajaratnam had sold his Goldman Sachs stock in the wake of Gupta's call to Rajaratnam, a call placed one minute after the end of the Goldman Sachs board of directors conference call in which Gupta learned that Goldman in December would report a quarterly loss. Rajaratnam responded to Lau's request for guidance on the market by advising that "the US is . . . relatively the safe haven" and providing his opinion with respect to specific sectors (id. at 1-2); but Rajaratnam went on to say that he had nonpublic information that, contrary to the prevailing view of market analysts, Goldman's current quarter would not be profitable (see id. at 2 ("I heard yesterday from somebody who's on the Board of Goldman Sachs, that they are gonna lose $2 per share. The Street has them making $2.50.")). Rajaratnam noted that Goldman would not report

21

its quarterly results until December; stated that if the stock price reached a certain level, he would sell short (see id. ("whack it")); and concluded, "I don't think it makes sense to take longer term views right now" (id.).

We see no error in the district court's finding that Rajaratnam's statements to Lau, "an important colleague and subordinate who had the ability to execute further trades in Galleon International" (Hearing Tr. 22), were in furtherance of the conspiracy of which Rajaratnam and Gupta were members. Although Gupta argues that in connection with these statements the government was required to "pro[ve] . . . not merely that Lau was theoretically capable" of trading in Goldman Sachs stock but that Rajaratnam's "purpose was to induce Lau to trade" (Gupta brief on appeal at 33 (emphasis omitted)), this argument ignores the allegation and the proof that one of the goals of the conspiracy was to use inside information to avoid losses--a goal clearly pursued by Rajaratnam in dumping his Goldman Sachs shares as quickly as possible after learning that Goldman would later publicly announce a quarterly loss. Gupta had a 15 percent ownership stake in Galleon International, which was entitled to fees based on its performance. (See Tr. 1696.) Although Galleon International invested principally in securities of non-United States companies (see id. at 1467), it was not precluded from investing in domestic securities (see id. at 2415); and, indeed, it had in the past owned stock in Goldman (see GX 90). In light of this evidence, Rajaratnam's statements to Lau could have prompted Lau not to purchase Goldman shares for Galleon International in October 2008. This supports the district court's conclusion that such statements were in furtherance of the conspiracy of which Gupta was a member.

Although Gupta argues that Rajaratnam was simply "bragging" about his sources (Gupta brief on appeal at 35), this was at best an argument for the jury. Further, to the extent that it

22

could be permissible to view the conversation as Gupta urges, i.e., that it was merely a "casual conversation about past events," not one in which Rajaratnam's statements were in furtherance of the conspiracy (Gupta brief on appeal at 35-36 (citing United States v. Lieberman, 637 F.2d 95, 102 (2d Cir. 1980))), the clear-error standard for reversal has not been met. To the extent that there may be more than one permissible view as to Rajaratnam's purpose in making the October 24, 2008 statements to Lau, the district court's determination that the statements about Goldman shares were made in furtherance of the conspiracy was a choice between or among permissible inferences and hence cannot be deemed clearly erroneous, see Anderson, 470 U.S. at 574. Gupta's contentions provide no basis for overturning the district court's finding that Rajaratnam's statements to Lau were in furtherance of the insider-trading, loss-avoidance conspiracy of which Gupta was a member and by which Gupta sought to profit, and thus were admissible.

2. Statements Against Penal Interest

Rule 804(b)(3) allows the admission of statements against a declarant's proprietary, pecuniary, or penal interest if the declarant is unavailable as a witness. A statement is against such an interest if it is a statement that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

23

Fed. R. Evid. 804(b)(3) (emphases added). This Rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." Williamson v. United States, 512 U.S. 594, 599 (1994).

In assessing whether a statement is against penal interest within the meaning of Rule 804(b)(3), the district court must first ask whether "a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest," United States v. Saget, 377 F.3d 223, 231 (2d Cir. 2004) ("Saget"), cert. denied, 543 U.S. 1079 (2005), a question that can be answered only "in light of all the surrounding circumstances," Williamson, 512 U.S. at 604; see also Saget, 377 F.3d at 231 (an "adequately particularized analysis" is required). The proffered statement "[need] not have been sufficient, standing alone, to convict [the declarant] of any crime," so long as it would have been "probative" in a criminal case against him. United States v. Persico, 645 F.3d at 102.

If the court finds that the statement is against the declarant's penal interest, the court must then determine whether there are corroborating circumstances indicating "both the declarant's trustworthiness and the truth of the statement." United States v. Lumpkin, 192 F.3d 280, 287 (2d Cir. 1999). Further, "the inference of trustworthiness from the proffered 'corroborating circumstances' must be strong, not merely allowable." United States v. Salvador, 820 F.2d 558, 561 (2d Cir.), cert. denied, 484 U.S. 966 (1987). In the context of assessing whether a statement against penal interest was sufficiently reliable to satisfy the Confrontation Clause of the Constitution, we have noted that

> [a] statement incriminating both the declarant and the defendant may possess adequate reliability if . . . the statement was made to a person whom the declarant believes is an ally, and the circumstances indicate that those portions

24

of the statement that inculpate the defendant are no less reliable than the self-inculpatory parts of the statement.

Saget, 377 F.3d at 230 (internal quotation marks omitted).

The trial court's ultimate decision to admit such evidence is reviewed for abuse of discretion. See, e.g., United States v. Williams, 506 F.3d 151, 155 (2d Cir. 2007), cert. denied, 552 U.S. 1223 (2008); Saget, 377 F.3d at 231; United States v. Salvador, 820 F.2d at 562.

### a. Rajaratnam's Self-Incriminating Statements to Horowitz

Even if Rajaratnam's statements in his conversations with Horowitz on the morning after his September 23 purchases of Goldman Sachs stock were not in furtherance of the Rajaratnam-Gupta conspiracy, the pertinent statements were contrary to Rajaratnam's penal interest and therefore could properly have been admitted pursuant to Rule 804(b)(3). In the First Rajaratnam-Horowitz Call, Rajaratnam said, "I got a call at 3:58 . . . . [s]aying something good might happen to Goldman. . . . [S]o, I told Ananth to buy some" and "I went to Gary and said just buy me" (GX 21-T, at 1-2). In the Second Rajaratnam-Horowitz Call, Rajaratnam's statements included the following:

- I got a call, right, saying something good's gonna happen.

- I asked Ananth to buy some.

- Then I went to Gary . . . .

- Yeah at 3:58, I can't, I can't yell out in the fucking halls.

- Leon was very upset. You know, fuck him, look, I've kept my mouth shut when he gave me WaMu . . . .

- [I]f it was, one o'clock, I always am good with him, I always call him in, I tell him everything, you know? AMD, IBM, everything . . . .

(GX 22-T, at 2-3.)

25

The corroborating evidence included proof that Rajaratnam did receive a call minutes before the close of trading on September 23; that the call was from Gupta, who had said it was "urgent"; that Gupta was a Goldman Sachs board member who had just received confidential Goldman information; and that something quite good for Goldman did in fact happen and was announced after the close of trading that very day. And Rajaratnam's reference to having shared information with respect to "AMD" provided additional corroboration of Rajaratnam's knowing wrongdoing, as Anil Kumar--who was on Rajaratnam's list of five people to whom he would speak near the close of trading (see Tr. 210, 213-14)--testified at trial that he had "pled guilty to one count of securities fraud for giving insider information to Mr. Rajaratnam about a company called ATI and AMD's acquisition of it in 2006" (id. at 1767). Thus, it would have been well within the bounds of discretion for the district court to conclude that the statements by Rajaratnam were contrary to his penal interest because they exposed him to criminal liability for trading on the basis of inside information, and that they were sufficiently reliable to be admitted in evidence under Rule 804(b)(3).

b. Rajaratnam's Self-Incriminating Statements to Lau

We reach the same conclusion with respect to Rajaratnam's statements about his inside information on Goldman Sachs to Lau. In his conversation with Lau, Rajaratnam's statements included the following:

- I heard yesterday from somebody who's on the Board of Goldman Sachs, that they are gonna lose $2 per share. The Street has them making $2.50.

- [T]hey don't report until December . . . .

26

▪ So what he was telling me was that uh, Goldman, the quarter's pretty bad. . . . I don't think that's built into Goldman Sachs stock price. So if it gets to $105, I'm gonna, it's $99 now, it was at $102. I was looking for $105, I'm gonna whack it you know.

(GX 29-T, at 2.)

Given that this conversation occurred on October 24, 2008, less than two hours after Rajaratnam unloaded his Goldman Sachs stock--beginning one minute after the market opened--Rajaratnam's statement that he had "heard yesterday" from a Goldman board member that Goldman would lose money and would not report its losses until December clearly exposed him to criminal liability for trading on inside information. Moreover, Rajaratnam's statement that if the stock reached a certain level he planned to sell it short was an admission of a plan to engage in additional unlawful insider trading in the future.

Although Gupta argues that these statements were not sufficiently reliable to satisfy the statement-against-penal-interest exception, we disagree. The evidence as to the timing of the Goldman Sachs board's after-hours conference call on October 23, which ended at 4:49 p.m. and was followed by a 4:50 p.m. call from Goldman board member Gupta to Rajaratnam, coupled with Rajaratnam's commencing to dump his Goldman stock one minute after the market opened the next morning, provided ample corroboration for the October 24 statement that Rajaratnam had received information "yesterday" of Goldman's yet-to-be-announced "$2 per share" losses from "somebody who's on the Board of Goldman Sachs."

Again, Gupta argues that Rajaratnam was merely attempting to impress Lau. That was a contention that could be argued to the jury; but as "reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be

27

true," Williamson, 512 U.S. at 599, it would have been within the district court's discretion to find that Rajaratnam, as founder and head of Galleon, would have had no need to attempt to impress his subordinates and that he would not have made these self-incriminating statements without a foundation of truth.

## B. Limitations on Gupta's Defense Evidence

Gupta also contends that he is entitled to a new trial on the ground that the district court unduly limited evidence proffered by the defense to show that any communication by Gupta of inside information to Rajaratnam in the fall of 2008 was improbable. For the reasons that follow, we conclude that none of the challenged rulings constituted an abuse of the court's discretion and that a new trial is unwarranted.

### 1. Testimony by Gupta's Daughter

The "linchpin" of the defense (Gupta brief on appeal at 46) was the proposition that in mid-September 2008, Gupta was angry with Rajaratnam for having withdrawn $25 million from the Voyager fund (in which Gupta had invested $10 million and Rajaratnam had invested $40 million) without informing Gupta of the withdrawal and without alerting Gupta to withdraw some of his own capital--so angry that Gupta would not have shared inside information about Goldman Sachs with Rajaratnam. To establish Gupta's state of mind--and to suggest that his September 23 and October 23 calls to Rajaratnam were merely efforts to obtain information about Voyager--the defense proffered testimony from Gupta's daughter Geetanjali that on September 20 Gupta was angry with Rajaratnam, believing that Rajaratnam had cheated him. Gupta argues that

28

[s]pecifically, Geetanjali would have testified:

> He told me that he was upset about Voyager. He told me that he was worried about the performance of the fund and that he was frustrated that he couldn't get information from Raj about it.
>
> He also told me he was angry that Raj had taken money out of the fund without telling him and that he thought that that--he didn't understand why he had taken the money out of the fund, and why if he had taken money out of the fund, he had not gotten any of it.

(Gupta brief on appeal at 47 (quoting Tr. 3079 (Geetanjali's statement in response to questioning by the court outside the presence of the jury) (emphases in brief)).)

The government objected that this testimony would be hearsay; Gupta argued that it was admissible under Rule 803(3)'s "state of mind" exception to the hearsay rule. After exploring Geetanjali's proposed testimony in the absence of the jury and hearing arguments from both sides (see Tr. 2971-74, 3071-89), the district court ruled that Geetanjali could testify to Gupta's "attitude towards Rajaratnam" with respect to Voyager, "at a given point or maybe two or three points" in time, but that Geetanjali could not testify to the "substantive" details of what Gupta said, i.e., that Gupta stated that he believed Rajaratnam had cheated him (id. at 3087; see id. at 3086-89).

Accordingly, Geetanjali testified that on September 20, 2008, she had a "conversation with [her] father relating to an investment that [he] had with Mr. Rajaratnam called Voyager" (id. at 3093) and in that conversation Gupta expressed "significant concern" about his investment in Voyager (id. at 3094). Geetanjali continued as follows:

> THE COURT: And in relating this to you, what was his demeanor?
>
> THE WITNESS: He was upset. He was stressed. He was running his hands through his hair, which he often does when he's stressed. He was walking about. He was quite upset. He's normally a very calm and collected person.

29

THE COURT: Was it your understanding, if you had one, that this was because of how the investment was doing or because of how Mr. Rajaratnam was treating the investment or what?

THE WITNESS: It was more because of how Mr. Rajaratnam was treating the investment. My father had been very upset that--

THE COURT: No. You've answered the question.

(Tr. 3094.) Geetanjali also testified that Gupta was frustrated by the difficulty he was having in getting information from Rajaratnam about Voyager. (See id. at 3095; see also id. at 3100 (testifying that at Thanksgiving Gupta was still upset at Rajaratnam about the Voyager investment).) The court instructed the jury that Geetanjali's testimony was to be considered "only on the issue of what bearing it has, if at all, on Mr. Gupta's attitude toward Mr. Rajaratnam during the period of time in question" (id. at 3095), and that "the limited purpose for which" Geetanjali's testimony was admitted was "not for . . . whatever may or may not have been going on at Voyager, but only for what Mr. Gupta's state of mind was with respect to Mr. Rajaratnam at this particular time" (id. at 3100).

Gupta contends that the district court erred in preventing Geetanjali from testifying that Gupta believed Rajaratnam had cheated him, because

Gupta did not seek to introduce Geetanjali's testimony to prove that Rajaratnam had in fact stolen from him (a point that was undisputed anyway); rather, he wanted to show that he believed Rajaratnam had stolen from him at a particular point in time.

(Gupta brief on appeal at 48 (emphasis in original); see id. at 49 ("Gupta sought to establish that he believed at the time that Rajaratnam was defrauding him" (emphasis in original)).) Gupta argues that Rule 803(3) provides an exception to the hearsay rule for a declarant's then-existing state of mind and that "Geetanjali's testimony--that on September 20, Gupta told her 'he was angry that Raj had taken money out of the fund without telling him' [Tr. 3079]--was classically admissible evidence

30

establishing Gupta's state of mind, and directly relevant to his motive for calling Rajaratnam." (Gupta brief on appeal at 48-49 (emphasis added); see id. at 49 ("his statement was admissible as evidence of [his] belief" that Rajaratnam was defrauding him (emphasis added)).)

We disagree with the thrust of Gupta's arguments, as we think it clear from the record that the court's limitation on Geetanjali's testimony was not based on a view that the testimony was being offered for its truth but rather was based on its view that the jury would likely be unable to comprehend that the statement could be considered only to show Gupta's belief and not to show the truth of what he believed. For the reasons that follow, we conclude that the limitation imposed was within the court's discretion, and that, in any event, if it was error to have thus limited Geetanjali's testimony, the error was harmless.

### a. The Exercise of Discretion Under Rule 403

Generally, a statement made by a person while not testifying at the current trial, offered by that person to prove the truth of the matter asserted in his statement, is hearsay. See Fed. R. Evid. 801(a)-(c). Hearsay generally is inadmissible if it does not fall within an exception provided by Rule 803 or 804. See Fed. R. Evid. 802. Rule 803 provides an exception for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . ." Fed. R. Evid. 803(3) (emphasis added).

However, the fact that a statement falls within an exception to the hearsay rule does not mean that the statement is not to be classified as hearsay; nor does it mean that the statement is

automatically admissible. It means simply that the statement--assuming that the criteria specified in the exception are met--is "not excluded by the rule against hearsay," Fed. R. Evid. 803, 804(b) (emphasis added); see, e.g., Li v. Canarozzi, 142 F.3d 83, 88 (2d Cir. 1998). "The court retains its normal discretion to exclude the evidence on other grounds such as lack of relevance, see Fed.R.Evid. 402, improper purpose, see, e.g., Fed.R.Evid. 404, or undue prejudice, see Fed.R.Evid. 403." Li v. Canarozzi, 142 F.3d at 88; cf. United States v. Detrich, 865 F.2d 17, 21 (2d Cir. 1988) (for admissibility, it is not sufficient that a proffered statement is not hearsay: "To be admissible it must also be relevant.").

Under Rule 403, even if proffered evidence is relevant, it may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. Rule 403; see, e.g., Huddleston v. United States, 485 U.S. 681, 687-88 (1988); United States v. Reifler, 446 F.3d 65, 91 (2d Cir. 2006); United States v. Salameh, 152 F.3d 88, 122-23 (2d Cir. 1998) ("Salameh"), cert. denied, 525 U.S. 1112 (1999).

> In reviewing Rule 403 challenges, we "accord great deference" to the district court's assessment of the "relevancy and unfair prejudice of proffered evidence, mindful that it sees the witnesses, the parties, the jurors, and the attorneys, and is thus in a superior position to evaluate the likely impact of the evidence."

United States v. Quinones, 511 F.3d 289, 310 (2d Cir. 2007) (quoting United States v. Paulino, 445 F.3d 211, 217 (2d Cir.), cert denied, 549 U.S. 981 (2006)), cert denied, 555 U.S. 910 (2008). "A district judge's" ruling following a "Rule 403 analysis is reversible error only when it is a clear abuse of discretion." Salameh, 152 F.3d at 122. "To find such abuse, we must conclude that the challenged evidentiary rulings were arbitrary and irrational." United States v. Quinones, 511 F.3d at 307-08

32

(internal quotation marks omitted); see, e.g., United States v. Scott, 677 F.3d 72, 83-84 (2d Cir. 2012); Salameh, 152 F.3d at 110.

We see no arbitrariness or irrationality in the present case. In limiting Geetanjali's testimony, the trial court made a Rule 403 assessment that the admission of testimony that Gupta believed Rajaratnam had cheated him--which the court observed would be "cumulative," given that the court had (as discussed in Part II.B.1.b. below) admitted other evidence to the same effect (Tr. 3085)--would be unduly prejudicial. Noting that, unlike the other witnesses whose similar testimony had been admitted, Geetanjali had no personal knowledge about Voyager, the court reasoned the jury would have undue difficulty in distinguishing between the aspect of Geetanjali's testimony that could be considered for its truth as to Gupta's state of mind and the aspect that indicated that Gupta had been cheated. When Gupta's counsel argued that the defense would be prejudiced if it could not have Geetanjali testify that Gupta thought Rajaratnam had cheated him, the court responded,

I think the prejudice is the other way.

The jury is going to, I think, draw from this, because the government can't cross-examine the witness in any meaningful way, that Rajaratnam, in fact, cheated Gupta, that Gupta knew it and that Gupta, therefore, was completely outraged; and, hence, it carries a danger here that no other witness carries for the reasons that I've already elaborated on the record.

(Tr. 3086 (emphasis added); see, e.g., id. at 2972-73 ("[T]here is no way the jury can make th[e] distinction" between the belief and the substance of what was said to have been believed. "They are going to inevitably think if they accept this testimony at all that he is telling the truth to his own daughter, and they will be taking it for its truth, and I don't see how under 403 that gross violation of the hearsay rule can be avoided." (emphases added)).) Thus, the court limited Geetanjali's testimony

33

not on the ground that it was offered to prove that Rajaratnam had in fact cheated Gupta but rather because the court's view was that, if admitted, the jury would likely be unable to comprehend that it was not admitted for that purpose. We see no basis for second-guessing the district court's view as to the likely effect on the jury. Although it would have been within the court's discretion to admit the proposed Geetanjali testimony along with a clear and detailed limiting instruction to the jury if it believed such an instruction would be effective, we see no abuse of discretion in the court's decision to limit the testimony in light of its conclusion that there was "no way" such an instruction in this case would be effective.

We note that although Gupta perhaps would have us classify the court's ruling as arbitrary on the ground that Geetanjali was not allowed to state that Gupta was "angry" (Gupta brief on appeal at 22), the record does not support that contention. The court ruled that she would be allowed to testify to Gupta's "attitude" toward Rajaratnam; the record does not indicate that the court placed any restriction on the words she could use to describe his attitude. Geetanjali described Gupta as "quite upset" (Tr. 3094) and "frustrated" (id. at 3095) by his inability to get information from Rajaratnam about Voyager--descriptions likely sufficient to imply anger; and there was no ruling barring her from expressly describing him as "angry."

Gupta's additional contention that the limitation on Geetanjali's testimony made it seem "only that Gupta was upset in September 2008 about the performance of the Voyager investment" (Gupta brief on appeal at 22 (emphasis in original)) is belied by the testimony itself. The court asked whether Gupta was upset "because of how the investment was doing or because of how Mr. Rajaratnam was treating the investment or what"; Geetanjali responded "It was more because of how Mr. Rajaratnam was treating the investment." (Tr. 3094.)

34

Finally, Gupta suggests that allowing Geetanjali to testify that Gupta believed Rajaratnam had cheated him by taking money out of Voyager without alerting Gupta also to withdraw some of his capital from that venture would have been no more prejudicial than similar evidence that the court had previously admitted, because "the excluded statement did no more than confirm undisputed facts" (Gupta reply brief on appeal at 21). But this very argument substantiates the district court's view that this aspect of the Geetanjali testimony, with its potential for the jury to infer that Gupta had in fact been cheated, would have been cumulative. We cannot conclude that the court abused its discretion in viewing the potential for jury confusion and undue prejudice as substantially outweighing the cumulative evidence's probative value.

### b. Harmless Error

The fact that "the excluded statement did no more than confirm undisputed facts" (Gupta reply brief on appeal at 21) also contributes to our conclusion that, if the limitation on Geetanjali's testimony was error, the error was harmless. A party may gain relief for an "error in a ruling to admit or exclude evidence only if," inter alia, "the error affect[ed] a substantial right of the party." Fed. R. Evid. 103(a); see, e.g., Fed. R. Crim. P. 52(a) ("Any error . . . that does not affect substantial rights must be disregarded."). Thus, "[u]nder harmless error review, we ask whether we can conclude with fair assurance that the errors did not substantially influence the jury." United States v. Oluwanisola, 605 F.3d 124, 133 (2d Cir. 2010) ("Oluwanisola") (internal quotation marks omitted); see, e.g., Kotteakos v. United States, 328 U.S. 750, 764-65 (1946). If defense evidence has been improperly excluded by the trial court, we normally consider such factors as

(1) the importance of . . . unrebutted assertions to the government's case; (2) whether the excluded material was cumulative; (3) the presence or absence of evidence corroborating or contradicting the government's case on the factual questions at issue; (4) the extent to which the defendant was otherwise permitted to advance the defense; and (5) the overall strength of the prosecution's case.

Oluwanisola, 605 F.3d at 134; see also United States v. Miller, 626 F.3d 682, 690 (2d Cir. 2010) (focusing principally on the overall strength of the prosecution's case), cert. denied, 132 S. Ct. 379 (2011); United States v. Song, 436 F.3d 137, 139-40 (2d Cir. 2006) (focusing principally on the extent to which the defendant was otherwise able to present the defense and on the presence of evidence corroborating the government's case); United States v. Lawal, 736 F.2d 5, 9 (2d Cir. 1984) (focusing principally on the overall strength of the prosecution's case and on the cumulative nature and marginal probative value of the excluded evidence).

All five of the factors set out in Oluwanisola lead us to conclude that, if there was error, it was harmless. First, as to the assertions in the government's case that Gupta sought to rebut, he pointed to testimony by Kumar suggesting that Gupta did not learn of Rajaratnam's withdrawal of capital from Voyager until 2009 (see Tr. 1858-64); Gupta argued that the singular importance of the proposed evidence as to his conversation with Geetanjali was its timing--i.e., that Gupta told her he was upset with Rajaratnam on September 20 (several days prior to his September 23 call to Rajaratnam upon learning of the imminent Buffett investment) rather than not becoming upset until 2009. (See, e.g., id. at 3086 ("Your Honor, this proof is pretty critical and crucial because they put Kumar on there to try and move the date to fit their theory."); see also Gupta brief on appeal at 46-47.) Thus, "Geetanjali's statement that Gupta told her he was angry that Rajaratnam had impermissibly and covertly redeemed money from the Voyager fund . . . was offered to prove when Gupta formed his

belief about the redemptions." (Gupta reply brief on appeal at 20 (emphasis in original).) "The importance of this timing question cannot be overstated." (Id. at 19.)

But the court placed no restriction at all on the defense's ability to bring out the timing of Gupta's conversation with Geetanjali. Geetanjali testified amply that the conversation occurred on September 20, 2008. She testified that she remembered the date because, inter alia, it was her 30th birthday, and it occurred on a trip to Connecticut to celebrate both her birthday and her mother's birthday which was the next day. (See Tr. 3092-93.) Further, after Geetanjali proceeded to describe Gupta's being upset with Rajaratnam on account of Rajaratnam's treatment of the Voyager investment, the court highlighted the fact that that testimony was relevant to the "time" of Gupta's anger at Rajaratnam: It instructed the jury that Geetanjali's testimony was to be considered "only on the issue of what bearing it has, if at all, on Mr. Gupta's attitude toward Mr. Rajaratnam during the period of time in question" (id. at 3095 (emphasis added)), and that "the limited purpose for which" Geetanjali's testimony was admitted was "not for . . . whatever may or may not have been going on at Voyager, but only for what Mr. Gupta's state of mind was with respect to Mr. Rajaratnam at this particular time" (id. at 3100 (emphasis added)). The government's assertions as to the timing of Gupta's animus toward Rajaratnam thus did not go unnoticed or unchallenged.

Second, the testimony that the basis for Gupta's attitude toward Rajaratnam was that Rajaratnam had made a concealed withdrawal from Voyager was plainly cumulative. The government had introduced the testimony of Kumar that Gupta told him that Gupta had discovered that Rajaratnam had withdrawn some of Rajaratnam's capital from Voyager, and that Gupta said that this was "just plain wrong" and wanted to sue Rajaratnam (Tr. 1863). In addition, Gupta had introduced the deposition testimony of Ajit Jain that Gupta had told him "that he had $10 million

37

invested with Raj in some venture and he had been gipped [sic], swindled or cheated by Raj and he had lost his entire 10 million that he had invested with Rajaratnam." (Jain Deposition at 6; see Tr. 2722-24, 2775.)

As to the third Oluwanisola factor, "the presence or absence of evidence corroborating or contradicting the government's case on the factual question[] at issue," 605 F.3d at 134 (emphasis added), which was the timing of Gupta's anger at Rajaratnam, plainly Geetanjali's testimony contradicted the government's theory that Gupta was not angry about Rajaratnam's treatment of Voyager until early 2009. But there was also evidence corroborating the government's contention that Gupta was on friendly terms with Rajaratnam through the fall of 2008. The government introduced a voice mail message from Gupta to Rajaratnam on October 10, 2008, well after the September 20 conversation with Geetanjali, saying "Hey Raj, Rajat here. Just, uh, calling to catch up. I know it must be an awful and busy week. I hope you are holding up well. Uh, and I'll, uh, try to give you a call over the weekend to just catch up. Uh, all the best to you, talk to you soon. Buh-bye." (GX 25-T; see also GX 2128-MCK (a January 2009 email from Gupta to Rajaratnam wishing him a "Happy New Year" and "a restful week," forwarding information about a possible Galleon hiree, and concluding "Let's catch up soon").)

Fourth, the record easily establishes that Gupta was able, based on the evidence that was introduced, to advance his defense. The explicit testimony of Kumar and Jain that Gupta believed Rajaratnam had cheated him, along with documentary evidence that Rajaratnam had in fact withdrawn $25 million from Voyager and a tape-recorded conversation in which Rajaratnam stated he had not told Gupta about the withdrawal, were highlights of Gupta's summation to the jury, cited by his counsel Gary P. Naftalis as among Gupta's "badges of innocence" (Tr. 3266; see id. at 3270).

38

[A] second badge of innocence . . . . is Rajaratnam's defrauding of Mr. Gupta about the Voyager investment. . . . Remember Mr. Gupta invested $10 million in this Voyager investment, and ultimately--and it's kind of undisputed--he lost all of his $10 million. . . . We have heard testimony from a variety of sources about how Mr. Gupta was very upset about how he was treated with that investment, not only losing the money, but the conduct that he came to learn about which Rajaratnam engaged in which consisted of not giving him information.

(Id. at 3270 (emphasis added).) Naftalis argued:

[Kumar's] testimony is supportive of the fact that we were swindled, Mr. Gupta was swindled by Mr. Rajaratnam in his Voyager investment. If you remember, Mr. Gupta made this investment, put a lot of money, $10 million in Voyager, and it turned out that he lost every dime in that investment, every dime. He lost $10 million, and we also established, if you recall, that there was a schedule . . . .

. . . . This is what Government Exhibit 2105 shows, unbeknownst to Rajat Gupta, behind the back of Rajat Gupta, concealed from Rajat Gupta, that Raj Rajaratnam put his hands into the cookie jar and took $25 million out . . . .

. . . .

. . . [Y]esterday we put in evidence, an October 2nd tape, wiretap conversation that the government captured of Rajaratnam speaking on October 2nd with one of his colleagues, Mr. Santhanam, and in this conversation [Rajaratnam] admitted that he never told Rajat Gupta he had taken the equity out.

(Tr. 3258-59 (emphases added).)

MR. NAFTALIS: (Continued) Can you stop [the tape] for a second there? Go back to "I told him I didn't take the equity out."

"I didn't tell him, I didn't tell Rajat Gupta that I took the equity out. I didn't tell him I took the $25 million out."

You recall that Mr. Kumar told us . . . in October he had conversations, he is one of the many witnesses who testified on this subject about how Rajat Gupta was very upset because he had lost his money and indeed came to learn that he had been swindled by Mr. Rajaratnam who took the money out, concealed it from him.

(Tr. 3260 (emphases added); see also id. at 3272 ("As we know, because we've just played it a few minutes ago, we know that Mr. Rajaratnam had taken $25 million out of the fund and concealed it from Mr. Gupta.").) Counsel also cited the deposition of Jain:

> He told us, Mr. Jain, he testified by videotape, that on January 12, 2009, he had lunch with Mr. Gupta, and Mr. Gupta told him that he had $10 million invested with Rajaratnam, and he had been gypped, swindled and mistreated by Raj and lost his entire $10 million.

(Id. at 3276 (emphasis added).)

Counsel also emphasized that "we learned that Mr. Gupta . . . was very upset about how he had been treated by Mr. Rajaratnam" with respect to Voyager "as early as September 20." (Tr. 3271.) He argued that Geetanjali "told you that on the 20th she had [the] conversation with her father" in which Gupta showed he was quite upset, and counsel pointed out, inter alia, that "that is a date that stuck in [Geetanjali's] mind" because she was "celebrating on September 20, 2008 her 30th birthday" and "her mother's birthday . . . was on the 21st of September." (Id.)

In sum, the evidence "from a variety of sources," as defense counsel said (id. at 3270), including an exhibit, a wiretapped conversation, and testimony from three witnesses, was clearly sufficient to enable Gupta to present his main defense.

Finally, the government's circumstantial evidence that Gupta in fact passed confidential information to Rajaratnam on September 23 and October 23 was strong. The timing of Gupta's calls to Rajaratnam--each placed approximately one minute after Gupta received extraordinary news about Goldman Sachs's finances--and the timing and nature of Rajaratnam's large trades in Goldman Sachs stock, i.e., purchases within minutes of the first such call in the wake of Gupta's receipt of favorable information, and sales a month later within the first possible minute of trading after the call following

Gupta's receipt of unfavorable information, were powerful evidence that Rajaratnam was given the confidential information by Gupta. And that evidence was supported by Rajaratnam's statements, in the wake of those trades, to Horowitz and Lau.

We see no basis for a conclusion that, if Geetanjali had been allowed to testify that Gupta believed Rajaratnam's actions with respect to Voyager had cheated him--rather than to testify (as she was allowed to) that Gupta was quite upset over Rajaratnam's treatment of the Voyager investment--that testimony would have had any substantial influence on the jury. If it was error for the court to limit Geetanjali's testimony as it did pursuant to Rule 403, we conclude that the error was entirely harmless.

2. Evidence To Suggest an Alternative Tipper

Gupta's "second defense" at trial was to suggest that Rajaratnam had received the confidential Goldman Sachs information from a person other than Gupta. (Gupta brief on appeal at 53.) The person specified was David Loeb, a Goldman vice president who was "one of the sales guys who would call" Rajaratnam "a lot" (Tr. 274-75). Gupta sought to make this showing by proffering two taped telephone conversations and several dozen emails between Loeb and Rajaratnam (collectively the "documents" or "Loeb documents") that Gupta contended showed that Loeb had obtained inside information about technology companies including Intel Corporation and Apple Inc. and immediately attempted to reach Rajaratnam to pass that information to him. (See, e.g., id. at 2982, 2999.)

The district court refused to admit the Loeb documents on grounds of hearsay, relevance, lack of foundation, and, given the absence of a proper foundation, the likelihood that the

41

documents would cause jury confusion. On appeal, Gupta argues that the trial court's exclusion of these documents was error because "'the accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged'" (Gupta brief on appeal at 54 (quoting Holmes v. South Carolina, 547 U.S. 319, 327 (2006))), and that the proffered documentation showing "Loeb's history of providing Rajaratnam with inside information was sufficient to place an alternative-perpetrator theory before the jury" (Gupta brief on appeal at 53-54). Although Gupta's legal premise is sound, we disagree with his contention that his proffer was sufficient.

"Evidence is relevant if . . . it has any tendency to make a fact" that is "of consequence in determining the action" "more or less probable than it would be without the evidence." Fed. R. Evid. 401. The assessment of the relevance of evidence for the purpose of its admission or exclusion is committed to the sound discretion of the district court. See, e.g., George v. Celotex Corp., 914 F.2d 26, 28 (2d Cir. 1990). The trial court also has considerable discretion in deciding whether an adequate foundation has been laid for the introduction of relevant documents. See, e.g., Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 166 (2d Cir. 1998). We accord particular deference to the trial court's rulings as to foundation and relevance, and we will not overturn those rulings except for abuse of discretion. See, e.g., Krieger v. Gold Bond Building Products, 863 F.2d 1091, 1097 (2d Cir. 1988) (relevance); LaForest v. Former Clean Air Holding Co., 376 F.3d 48, 58 (2d Cir. 2004) (foundation).

At trial, in response to the government's contention that the Loeb documents were hearsay, Gupta argued that the information in the documents was "not being offered for the truth. It is being offered for the fact that Loeb is saying I have information for you urgently or information that is important, please give me a call or may I call you." (Tr. 2986.) The government pointed out,

however, that Gupta was seeking to introduce the documents without calling any witness to provide a foundation indicating that the information was in fact confidential. The government argued that to the extent that the documents themselves portrayed the information as confidential, they were, in the absence of other evidence to show confidentiality, necessarily being offered for the truth of that portrayal; otherwise the documents were not relevant to indicate that Rajaratnam received confidential information about Goldman finances from Loeb, and their admission could only confuse the jury. Likewise, as to documents in which Loeb referred to information characterized as important without stating that it was confidential, there was, in the absence of other evidence to establish confidentiality, no foundation for a finding that the documents--none of which related to information concerning Goldman Sachs--were relevant. (See id. at 2994-95.)

Although Gupta argued that "[t]here [wa]s substantial evidence that supports the argument that Mr. Loeb could well have been the source of the alleged tips[,] if they happened[,] relating to Goldman Sachs" (id. at 2998-99), he proffered no evidence to show that Loeb had access to the confidential information about Goldman finances that triggered Rajaratnam's trading following the September 23 and October 23 calls. To the contrary, there was evidence that Goldman kept its "securities division [of] salespeople and traders that interacted with investors" physically and technologically separated from its equity capital markets division (id. at 1588-89); the latter division was "privy to a lot of confidential information" (id. at 1589) and developed the Buffett investment, which was "extremely confidential" because of its potential impact on Goldman's share price (id. at 1590; see id. at 1588-95). Loeb was in the securities division, not the equity capital markets division. (See id. at 2873-75 ("Loeb was an institutional salesperson," whose job it was to attempt to sell securities based on research done by Goldman analysts).) And although there was evidence

43

that Loeb was on Rajaratnam's list of 10 important persons (see, e.g., id. at 273-75)--Loeb was in charge of Galleon's securities account at Goldman (see id. at 2875)--and that he called Rajaratnam "a lot" (id. at 274-75), Eisenberg, Rajaratnam's assistant, testified that the man who called asking "urgent[ly]" to speak to Rajaratnam near the close of the market on September 23 (id. at 238-39) was not Loeb (see id. at 327).

The district court concluded that the Loeb documents were replete with inadmissible hearsay (see Tr. 3000, 3065); that they "suffer[ed] from," inter alia, a "lack of foundation" (id. at 3000); and that in the absence of explanatory testimony by a witness the jury would be unable to understand the documents without representations by counsel or speculation, either of which would be improper (see id. at 3065). As Gupta insisted on relying solely on the documents themselves, choosing not to call a witness or to present other evidence to lay a foundation for his contention that the information referred to in the Loeb documents was "inside" information (Gupta brief on appeal at 54), we see no error in the trial court's rulings. See generally United States v. Harwood, 998 F.2d 91, 97 (2d Cir.) (a "statement [that] is irrelevant unless it was true . . . would be hearsay[] and inadmissible"), cert. denied, 510 U.S. 971 (1993).

3. Evidence of Proposed Charitable Giving

During the government's case, a portion of the notes taken by Gupta's financial advisor during an April 2008 meeting with Gupta was admitted in evidence to show that Gupta had an ownership interest in Galleon International. Pursuant to the rule of completeness, see Fed. R. Evid. 106, the court allowed Gupta to introduce other parts of those notes concerning other sources of his wealth. The court rejected, however, Gupta's attempt to introduce still other portions of the notes that

44

read, in part, "want to give to charity while alive" and "? 80% to charity & 20% to extended family? perhaps" (GX 5517) (the "wealth distribution notes"). The court ruled that, as offered by Gupta, the wealth distribution notes were inadmissible hearsay, that they would be unduly confusing and prejudicial, and that their admission was not justified under Rule 106. Gupta challenges this ruling, arguing that the portion of the notes that "recorded Gupta's intent to donate most of his wealth to charity" (1) "was not hearsay, as it went to Gupta's state of mind," and (2) in any event "should have been admitted to ensure a fair and impartial understanding of the admitted portion." (Gupta brief on appeal at 50-51.) Neither contention has merit.

Gupta's first argument is doubly flawed. To the extent that the above text reflected statements by Gupta, it was plainly hearsay when offered by Gupta. It did not become nonhearsay even if it reflected his state of mind; if it did so reflect, it merely had the potential to fall within an exception to the general rule that hearsay evidence is to be excluded. More importantly, as discussed in Part II.B.1.a. above, the fact that a hearsay statement falls within an exception does not make the statement admissible. It must meet the requirements of, inter alia, relevance, and it must not be excludable on the grounds of undue confusion or prejudice under Rule 403. Even if the wealth distribution notes--which were surrounded by question marks and followed by the word "perhaps"-- reflected Gupta's actual intent to give 80 percent of his wealth to charity, such intentions were irrelevant to whether Gupta had achieved (or was about to achieve) some of his wealth unlawfully.

Nor were the wealth distribution notes admissible under Rule 106 for purposes of completeness. That Rule provides: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part--or any other writing or recorded statement--that in fairness ought to be considered at the same time." Fed. R. Evid.

45

106 (emphasis added). "The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." United States v. Johnson, 507 F.3d 793, 796 (2d Cir. 2007) (internal quotation marks omitted), cert. denied, 552 U.S. 1301 (2008). We see no abuse of discretion, see, e.g., id., in the ruling that the wealth distribution notes were not necessary for completeness here. The notes as to Gupta's ownership interest in Galleon International were relevant to show that Gupta had a financial stake in the profitability of Galleon International; that stake was relevant to show that Rajaratnam's advising Lau in October 2008, just after learning that Goldman would report a quarterly loss, not to buy shares of Goldman was in furtherance of the conspiracy among Rajaratnam, Gupta, and others to profit and avoid losses by trading on the basis of inside information. Whatever thought Gupta may have had as to how to distribute his wealth was not relevant to whether or not he had a stake in Galleon International.

### 4. Character Evidence

At trial, Gupta called several character witnesses who testified to their opinions that Gupta was an honest person. Gupta also sought to have the witnesses testify to their opinions that he had "integrity" (Tr. 2331). The government objected to the giving of opinions on "integrity" to the extent that the defense wanted to elicit testimony "that [Gupta] obeys the law." (Id.) The court noted that there were several dictionary definitions of integrity (see id. at 2331-32) and asked what, other than honesty, Gupta expected the jury to understand by the word "integrity" (id. at 2333). Defense counsel responded with the dictionary definition that read "moral soundness, honesty, uprightness." (Id.) The court upheld the government's objection, concluding that moral soundness and uprightness

46

themselves were unduly ambiguous and would convey concepts not pertinent to the present case. The court allowed Gupta's character witnesses to give their opinions only as to Gupta's honesty--the relevant aspect of the dictionary definition cited by defense counsel.

Gupta contends that the district court erred in not allowing him to question witnesses about his "integrity," arguing that his honesty was not at issue in the case because he was not charged with making any false statement. We reject his contention.

The trial court has broad discretion in its rulings on the admissibility of character testimony, and such decisions "will be reversed only upon a clear showing of prejudicial abuse." United States v. Morgan, 554 F.2d 31, 33-34 (2d Cir. 1977). We see no abuse of discretion in the court's conclusion that, other than honesty itself, the aspects of the "integrity" definition cited by defense counsel were not pertinent to this case.

Gupta also argues that the district court should have instructed the jury that "character testimony may in and of itself raise a reasonable doubt" as to a defendant's guilt of the charges against him (Tr. 3039). The district court declined to give such an instruction because it "artificially singles out one aspect of the proof and gives it sort of prominence above all others by implication," and noted that, although such an instruction is "commonly given," no case law required him to give it. (Id. at 3039-40.)

The district court's understanding of the law of this Circuit was correct. We have held that an instruction that character testimony may by itself raise a reasonable doubt is not required. See United States v. Pujana-Mena, 949 F.2d 24, 27-28 (2d Cir. 1991) ("Pujana-Mena"). Although Gupta asks us to "reconsider" Pujana-Mena, arguing, in part, that it is "contrary" to two Supreme Court cases (Gupta brief on appeal at 60-61), we decline to do so. Both of the Supreme Court cases

47

cited by Gupta--<u>Edgington v. United States</u>, 164 U.S. 361 (1896), and <u>Michelson v. United States</u>, 335 U.S. 469 (1948)--preceded <u>Pujana-Mena</u> and were cited in and distinguished by <u>Pujana-Mena</u>, <u>see</u> 949 F.2d at 28-30. Gupta has cited no intervening change in the law suggesting that <u>Pujana-Mena</u> was wrongly decided; and even if this panel had the authority to overturn a prior panel decision in another case, we would see no basis for concluding that <u>Pujana-Mena</u>'s interpretation of those Supreme Court precedents was incorrect.

CONCLUSION

We have considered all of Gupta's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.